**In re TAK COMMUNICATIONS, INC.**
**Tak Broadcasting Corporation,**
**Debtors.**

**Bankruptcy Nos. MM11–91–**
**00031, MM11–91–00032.**

United States Bankruptcy Court,
W.D. Wisconsin.

April 30, 1993.

Brady C. Williamson, LaFollette & Sinykin, Madison, WI, for debtor.

Brian Rosen, Susan Larson, Weil, Gotshal & Manges, New York City, Michael B. Van Sicklen, Foley & Lardner, Madison, WI, for the Unsecured Creditors' Committee.

Mark S. Schmitt, Miller, Simon & Maier, S.C., Milwaukee, WI, for Time Warner Entertainment, et al.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

■ This matter comes before the court on the third application of Weil, Gotshal & Manges ("WGM") for the allowance of interim compensation and reimbursement of expenses. On January 3, 1991, Tak Communications, Inc. and Tak Broadcasting Corporation ("Tak") filed for relief under Chapter 11 of the Bankruptcy Code. In an order dated March 3, 1991, I approved the retention of WGM and Foley & Lardner as joint counsel for the unsecured creditors' committee of Tak. I allowed WGM's first application for interim compensation of $54,301.00 and reimbursement of expenses of $8,930.28 for the period from February

1, 1991 through April 30, 1991. I further allowed WGM's second application for interim compensation of $208,168.00 and reimbursement of expenses of $25,180.98 for the period from May 1, 1991 through August 31, 1991. No objections were filed to either of the allowed applications.

On September 30, 1992, a hearing was held to consider a third application in which WGM requested interim compensation of $750,344.00 and expenses of $93,776.70 for the period from September 1, 1991 through June 30, 1992. Objections to the application had been filed by Tak, and by creditors Time Warner Entertainment Company, L.P., Columbia Pictures Television, Inc. and Paramount Pictures Corporation.[1] At the September 30, 1992 hearing, I allowed $500,000.00 in fees and $50,000.00 in expenses (approximately the amounts to which no specific objection was made) and set the matter for further hearing on the remaining fees. On October 23, 1992, after a full-day trial, I took the application under advisement.

The objections to the fees and expenses are numerous and detailed. Tak noted that the fee application does not comply, in form or substance, with the requirements of 11 USC § 330, Bankruptcy Rule 2016, or the particular standards previously articulated by this court. *See In re Reliable Investors Corp.*, 60 B.R. 98 (Bankr.W.D.Wis.1986); *In re Chapman Farms*, 58 B.R. 822 (Bankr.W.D.Wis.1986). Specifically, Tak argued that the fee application contains impermissible "block billing" entries and lacks a "detailed statement" of the services rendered as required by Bankruptcy Rule 2016. Tak further argued that WGM did not efficiently use its local co-counsel to avoid duplicative services and expenses, used multiple attorneys for services that could have been performed by one attorney, performed services for individual creditors on the creditors' committee, and billed an excessive amount for expenses.[2]

---

**1.** Time Warner Entertainment Company, L.P. and Columbia Pictures Television, Inc. are members of the creditors' committee.

**2.** In its proposed findings of fact and conclusions of law filed on October 19, 1992, Tak

contested the following tasks and amounts but generally did not suggest appropriate amounts:

| | |
|---|---|
| 1) FCC litigation | $16,003.50 |
| 2) Duplicated work | |
| a) depositions | $79,776.50 |
| b) creditor comm. mtgings | $36,836.50 |

Time Warner Entertainment Company, L.P., Columbia Pictures Television, Inc., and Paramount Pictures Corporation ("Programmers") also objected to the form of the fee application and the absence of detailed descriptions of the work done. The Programmers further objected to certain fees and reimbursements because they represented, *inter alia,* services rendered for individual clients, excessive research on areas of the law in which WGM claimed to have professional competence, duplication of activities, overstaffing, unnecessary services, and expenses in excess of their actual cost or which were part of WGM's general overhead.[3]

On January 8, 1993, Tak's Chapter 11 plan was confirmed. The objectors then withdrew their objections to the fee application.

■ I now face the difficult task of reviewing attorneys' fees in bankruptcy.[4] The withdrawal of the objections to the fee application does not end the inquiry into the reasonableness of the requested fees. *See In re Bonneville Pacific Corp.,* 147 B.R. 803, 805 (Bankr.D.Utah 1992) ("The ultimate determination that all requirements of the statute have been met rests with the Court"). Whatever its responsibility may be in the absence of any objection, once an objection has been made and evidence and argument have been presented in support of the objection, a court may not adopt the ostrich's fabled position, but rather must assess the reasonableness of the fee application.

Section 330 of the Bankruptcy Code provides that the court may award reasonable compensation to a professional person employed under 11 USC § 327 or § 1103 for the actual, necessary services rendered. The compensation award is based on the nature, extent, and value of such services, the time spent on such services, and the cost of comparable services other than in a bankruptcy case. The balancing of two policies underlies § 330: economizing in the interest of the estate while encouraging qualified lawyers to take bankruptcy cases. *See* S.Rep. No. 95–989, 95th Cong, 2d Sess 40–41 (1978). Many courts have adopted the following criteria to guide the awarding of attorney's fees:

1. The time and labor required.

2. The novelty and difficulty of the question.

3. The skill required to perform the legal services properly.

4. The preclusion of other employment by the acceptance of this employment.

5. The customary fee.

6. Whether the fee is fixed or contingent.

7. Time limitations imposed by the client or other circumstances.

8. The amount involved and the results obtained.

| | |
|---|---:|
| 3) Block billing | ? |
| 4) Proofs of claim for creditors | $7,311.00 |
| 5) Document processing | $14,299.00 |
| 6) Taxi/transportation | $4,800.50 |
| 7) Meals | $7,278.65 |
| 8) Research WI law | $8,240.00 |
| 9) Meetings | $25,800.00 |

**3.** In their proposed findings of fact and conclusions of law filed on October 19, 1992, the Programmers asked the court to disallow part or all of the following:

| | |
|---|---:|
| word processing | $14,299.00 |
| computer research | $9,199.04 |
| meals | $7,278.65 |
| taxi/transportation | $4,957.50 |
| in-house copying | $40,782.40 |

The Programmers further asked the court to reduce the fees by the following amounts for the following reasons:

| | |
|---|---:|
| reduction for block billing | $50,000.00 |
| reduction for preparing proofs of claim for creditors | $6,000.00 |
| reduction for research & memo re: fraud. conveyances | $20,000.00 |
| reduction for research re: WI causes of action | $5,000.00 |
| reduction for presence of multiple attorneys | $50,000.00 |

**4.** Judge Posner has commented on the unattractiveness of determining attorneys' fees:

Fee litigation has become a heavy burden on the federal courts. It can turn a simple civil case into two or even more cases—the case on the merits, the case for fees, the case for fees on appeal, the case for fees for proving fees, and so on ad infinitum, or at least ad nauseam.

*Ustrak v. Fairman,* 851 F.2d 983, 987 (7th Cir. 1988) (citation omitted).

9. The experience, reputation and ability of the attorney.

10. The undesirability of the case.

11. The nature and length of the professional relationship with the client.

12. Awards in similar cases.

*See In re Reliable Investors Corp.,* 60 B.R. 98, 101 (Bankr.W.D.Wis.1986) (citations omitted); *see also Hensley v. Eckerhart,* 461 U.S. 424, 430, n. 3, 103 S.Ct. 1933, 1937, n. 3, 76 L.Ed.2d 40 (1983) (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974)).

Pursuant to § 331, the court may award interim compensation to any professional employed under § 327 or § 1103. An entity seeking interim compensation must file "an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Bankruptcy Rule 2016(a). The applicant bears the burden of proving the necessity and reasonableness of its fees. *In re Chapman Farms,* 58 B.R. 822, 824 (Bankr.W.D.Wis.1986). As a priority claim, a claim for attorney's fees is subject to strict scrutiny. *In re Reliable Investors Corp.,* 60 B.R. 98, 101 (Bankr. W.D.Wis.1986) (citations omitted).

Section 330 of the Bankruptcy Code and its legislative history express the intent that "compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy cases." *In re UNR Industries, Inc.,* 986 F.2d 207, 209 (7th Cir.1993) (citing 11 U.S.C. § 330; HR Rep No 595, 95th Cong, 2d Sess 329–30 (1978)). Although the Seventh Circuit has rarely addressed the issue of attorneys' fees under the Bankruptcy Code, the court has repeatedly addressed the award of reasonable attorneys' fees in cases involving fee-shifting statutes. The Seventh Circuit has recently indicated that, at least with respect to fee enhancements, the principles applicable under fee-shifting statutes are relevant to fee determinations in bankruptcy cases. *See id.* at 210. The court did note, however, that " 'the general principles may require some accommodation to the peculiarities of bankruptcy matters....' " *Id.* (quoting *In re Manoa Finance Co., Inc.,* 853 F.2d 687, 691 (9th Cir.1988)).

■ The Supreme Court has stated that the determination of a reasonable fee award begins with the "lodestar" calculation whereby the number of hours reasonably expended is multiplied by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433–434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *see also State of Ill. v. Sangamo Const. Co.,* 657 F.2d 855, 862 (7th Cir.1981). The calculation of a "reasonable fee" thus requires two separate determinations: first, the reasonableness of the hours expended, and second, the reasonableness of the hourly rate.

■ In assessing the reasonableness of the hours expended, the Seventh Circuit has stated that "[i]t is recognized that a judge, from experience, is sufficiently informed so that he may exercise some discretion in deciding that the requested number of hours was not reasonably expended." *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 765 (7th Cir.1982), *cert. denied* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Examples justifying reducing attorneys' fees include: overstatement of an attorney's hours, duplication of services by two attorneys, inefficient use of time and accumulation of hours beyond those reasonably required for the case. *Id.* at 765, n. 11.

In support of its fee application, WGM has submitted 272 pages of time sheets filled with remarkably opaque descriptions of services. Additionally, the firm has submitted over fifty exhibits as well as a response and a supplemental response to the objections. Likewise, the objecting parties have filed voluminous exhibits and briefs in this matter. Rather than arduously wading through the ocean of papers filed, I have carefully reviewed a few of the tasks performed by WGM to determine the necessity and reasonableness of the requested fees. My review is intended to provide a sample of the nature and quality of the work for which compensation is sought. *See Evans v. City of Evanston,* 941 F.2d 473, 476–477 (7th Cir.1991) (finding that judge may take a sample of work from the time sheets and extrapolate from the sam-

ple to determine whether lawyers had spent an excessive amount of time on the case), *cert. denied* —— U.S. ——, 112 S.Ct. 3028; 120 L.Ed.2d 899 (1992); *see also In re Continental Illinois Securities Litigation,* 985 F.2d 867, 868 (7th Cir.1993). As I informed counsel at the October 23, 1992 hearing, I have concentrated my sampling on the services and fees highlighted by arguments and exhibits presented· at the hearing.

WGM requests fees for 4,442.20 hours of services billed at hourly rates ranging from $390.00 per hour to $50.00 per hour. In its recent decisions, the Seventh Circuit has stressed the importance of the market in assessing the reasonableness of attorneys' hourly rates. *See, e.g., Gusman v. Unisys Corporation,* 986 F.2d 1146 (7th Cir.1993) (in assessing a "reasonable attorney's fee" under fee-shifting statute, hourly rates charged by attorneys are presumptively appropriate even where the attorneys charge higher rates than the prevailing rates in the locality); *Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir.1992) ("[f]ee litigation under [42 USC] § 1988 depends on what the market rate is rather than what litigants and judges think it ought to be"); *Barrow v. Falck,* 977 F.2d 1100, 1105 (7th Cir.1992) (market rate for attorneys' time is the opportunity costs of their time); *In re Continental Illinois Securities Litigation,* 962 F.2d 566 (7th Cir.1992) (attorneys should be awarded the same hourly rates of compensation in cases where fees are awarded by court order as they would receive if they sold their services in the open market).

Generally, in addition to a review of services, a separate inquiry is appropriate to determine whether the hourly rate of charge reflects accurately the numerous factors identified by the Supreme Court as appropriate criteria for assessing reasonableness of that component of the lodestar calculation. *See Hensley v. Eckerhart,* 461 U.S. 424, 430, n. 3, 103 S.Ct. 1933, 1937, n. 3, 76 L.Ed.2d 40 (1983) (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974)). Because the objectors did not provide a focus for that inquiry, I have scant evidence regarding the market for billing rates. Thus, I have chosen to concentrate my review on the identified deficiencies in WGM's services. Those include, *inter alia:* the quality of the work done, the accumulation of excessive hours, the failure to utilize qualified local counsel to avoid excessive costs, and the inadequate description of services in the application.

### SERVICES RENDERED FOR INDIVIDUAL CLIENTS

At the September 30, 1992 hearing, WGM informed the court that it would withdraw its request for reimbursement for time spent preparing proofs of claim on behalf of certain members of the creditors' committee. WGM estimated that the time spent on that task equalled approximately $1,600.00 [5] of the $750,344.00 total sought. In contrast, Tak and the Programmers estimated that the time spent equalled $7,311.00 and $6,000.00, respectively.

The lack of agreement in even this relatively small dispute accentuates the inability of any party—including, apparently WGM—to extract the necessary information from the fee application. Each entry in WGM's time sheets lists the date of services, the attorney or paralegal who billed the hours, the hours billed, the price of the services, and the activities performed. Slightly modified in form to accommodate for computer differences, a typical entry is:

| Date | Timekeeper | Time | Amount | Description |
|---|---|---|---|---|
| 4/21/92 | ROSEN, BRIAN | 9.10 | 2,593.50 | PREPARE FOR AND ATTEND MEETING AT FURMAN SELZ; DRAFT AND REVISE PLAN OF REORGANIZATION (PARTNERSHIP AND CORPORATE STRUCTURES); OCS: LARSEN AND MANLEY; TCS: LALIM (re: Tax Structure),[6] GOLDRING (re: Tax Analysis/AA Numbers) |

5. In the light of my other review of services and charges by WGM, it is almost incredible that there is any legal task which WGM would perform for as little as $1,600.00.

6. WGM submitted its fee application with accompanying time sheets on August 4, 1992.

As exemplified above, WGM employs what is commonly called "block billing," which is the grouping together of several discrete tasks in one entry. "Block billing" is universally disdained for its role in denying a meaningful review of fee applications. Unable to ascertain the amount of time spent on a specific task, the parties must either make imperfect estimates regarding the amount of time spent or, worse yet, rely on the word of the party who is seeking the fees. To avoid this obviously unattractive proposition, Bankruptcy Rule 2016(a) requires a detailed statement of the services rendered, time expended and expenses incurred.

With respect to the proofs of claims, several "block" entries in the time sheets indicate that WGM spent an unspecified amount of time preparing proofs of claims for committee members.[7] Without referring the court to any particular entry or entries in its time sheets, WGM estimated that the cost of preparing the proofs of claim was approximately $1,600.00. An associate at WGM further testified that she could not determine the exact amount of time spent on the preparation of these proofs of claim. Transcript of the October 23, 1992 Hearing on WGM's Fee Application (*"Transcript"*), at 136–142. Because the block billing makes it impossible to ascertain the amount of time spent in preparing the proofs of claims, I am unable to determine the price of those services.

Subsequently, in an effort to more accurately describe the services rendered, WGM submitted a copy of the original time sheets which had been "amended" to include handwritten remarks in numerous entries. The material in parentheses represents those handwritten additions.

**7.** Entries apparently referring to proofs of claim include, but may not be limited to:

| Date | Time | Amount | Description |
|------|------|--------|-------------|
| 4/15/92 | 10.20 | 1,836.00 | TC W/SIMSOLO RE: PROOFS OF CLAIM; LETTER TO DAMON BALL AND SCOTT LALIM RE: SAME; TCS W/L. BEDELL RE: SCHEDULING 2004 EXAM. OF P. DAVIDSON; TC W/B. WHITNEY'S SEC'Y RE: SAME; TC W/J. KING RE: SAME; CONF, W/B. ROSEN RE: SAME; TC W/S. GOLDRING RE: TAX SECTION OF DISCLOSURE STATEMENT; REVIEW FILES FOR BACK UP OF SUBORDINATED DEBTHOLDERS' PROOFS OF CLAIM; CONF. W/MANLEY RE: SAME; CONF. W/LOPERFITO RE: BSRS FOR THE FEE APPLIC.; TC W/ROSEN AND HARRIS RE: FURMAN SELZ RULE 2004 EXAM; TC W/BRADY WILLIAMSON RE: SAME; REVISE DISC. STMT. |
| 4/16/92 | .50 | 65.00 | COLLECTING MODEL PROOF OF CLAIM |
| 5/07/92 | 10.70 | 1,926.00 | REVISE COMMITTEE'S DISCLOSURE STATEMENT; TC W/GOLDRING RE: TAX ISSUES AND PLAN; TC W/WHITNEY RE 2004 EXAM. OF DAVIDSON; SEND 2004 EXHIBITS TO WHITNEY; LETTER TO D. BALL RE: PROOF OF CLAIM INFORMATION; TC W/B. ROSEN. |
| 5/20/92 | 4.80 | 864.00 | TC W/WILLIAMSON RE: SYNDICATION CONTRACTS; TC W/SHAPIRO RE: TAX ISSUES AND THE PLAN; TC W/S. LALIM RE: DUE DILIGENCE IN PHILADELPHIA; TC W/VAN SICKLEN RE: PREFERENCE ACTIONS; DRAFT LUTHERAN BROTHERHOOD PROOF OF CLAIM; CASE FILING. |
| 5/21/92 | 6.70 | 1,206.00 | REVISE COMMITTEE'S OBJECTION TO BANKS' DISCL. STMT; CONF. W/MANLEY RE: SAME; CONF. W/ROSEN RE: SAME; DRAFT PROOF OF CLAIM FOR LUTHERAN BROTHERHOOD. |
| 6/02/92 | 4.20 | 756.00 | DRAFT/REVISE PROOF OF CLAIM FOR LUTHERAN BROTHERHOOD & EQUITY LINKED INVESTORS II, L.P.; TC W/REDMON RE: SYNDICATION CONTRACTS, SEND SAME TO REDMON FOR REVIEW; CASE FILING. |

### QUALITY OF WORK PRODUCT

In examining the reasonableness of a fee request, I must determine whether the quality of the work performed justifies the fee sought. Because WGM failed in its research to locate or apply the decisions on the requirements for fee applications in the Western District of Wisconsin,[8] I surmise that it was equally remiss in its research of other issues in this case. Sampling the exhibits received confirms this suspicion.

Under seal of the court, the Programmers submitted, as the Objectors' Exhibit 2, a draft memorandum prepared by WGM. In answer to my inquiry at the October 23, 1992 hearing, WGM's lead partner in this case stated that this exhibit best reflected the quality of the work done on the fraudulent conveyance issue researched by WGM. He noted, however, that the Objectors' Exhibit 2 represented a rough draft that was later abandoned to allow WGM to focus on other issues. *Transcript,* at 158–159. Without revealing the content of the memorandum, much can be observed about the quality of the work. Of its forty-two pages, only eight pages contain analysis of the legal issue. Of those eight pages, almost two pages are devoted to direct quotations from the Restatement of Conflicts of Laws or the Uniform Fraudulent Conveyance Act. The remaining six pages of sparse legal analysis is comprised mostly of general and simple statements. There is almost no synthesis of the extensively presented facts and the black letter law provided. At best, the memorandum is superficial. It contains no evidence of a greater understanding of fraudulent transfer law than that generally held by and expected of a journeyman bankruptcy lawyer. Although it is difficult to calculate with specificity the time spent on this memorandum,[9]

8. *In re Reliable Investors Corp.,* 60 B.R. 98 (Bankr.W.D.Wis.1986); *In re Chapman Farms,* 58 B.R. 822 (Bankr.W.D.Wis.1986); *In re Moody,* 1984 WL 32, No. MM11–83–00167 (Bankr. W.D.Wis.1984).

9. Entries apparently relating to the research and drafting of the fraudulent conveyance memorandum include, but may not be limited to:

| Date | Time | Amount | Description |
|---|---|---|---|
| 9/05/91 | 3.80 | 1,653.00 | TCS: COHEN (re: WUSL management), FAHNESTOCK, BALL (re: status of negotiations), SANTARLASCI (re: proposed meeting); REVIEW PRODUCED DOCUMENTS; LETTER TO KERKMAN; LETTER TO WILLIAMSON; REVIEW AND REVISE FEE APPLICATION; REVIEW FRADULENT [sic] TRANSFER MEMORANDUM; OCS; LARSEN. |
| 9/05/91 | 3.70 | 666.00 | REVISE TAK FEE APPLICATION; REVIEW TAK CORRESPONDENCE; REVIEW DOCUMENTS SENT BY B. WILLIAMSON RE: FRAUDULENT CONVEYANCE ANALYSIS; MTG W/B. ROSEN RE: SAME. |
| 9/06/91 | 5.30 | 954.00 | FRAUDULENT CONVEYANCE ANALYSIS—REVIEW DOCUMENTS SENT BY B. WILLIAMSON & B. MERCER; REVIEW AND REVISE COMMITTEE BRIEF RE: FCC LICENSE LITIGATION; MTG W/D. LOWE RE: CASE FILING. |
| 9/08/91 | 4.50 | 810.00 | FRAUDULENT CONVEYANCE ANALYSIS—REVIEW FRONTIER ANALYSIS. |
| 9/09/91 | 2.20 | 396.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research). |
| 9/10/91 | 5.80 | 1,653.00 | MEETING W/LARSEN RE: FCC LITIGATION; REVIEW FINAL FCC BRIEF IN OPPOSITION; REVIEW FRAUDULENT CONVEYANCE DOCUMENTS; TCS: VAN SICKLEN (and) WALSH (re: FCC Litigation), LALIM (re: status), BALL (re: WUSL management), HARRIS (re: models of projected returns), SIMSOLO. |
| 9/10/91 | 3.10 | 558.00 | MTG W/B. ROSEN RE: STATUS OF CASE; FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); TC W/ LATHAM & WATKINS RE: RETRIEVAL OF PLEADINGS RE: REDUCTION IN COMPENSATION. |

(To conserve space, from this point this listing will only include the reference to the fraudulent conveyance analysis. It can be assumed, unless otherwise mentioned, that the entry in the time sheets includes other activities).

| | | | |
|---|---|---|---|
| 9/11/91 | 3.30 | 594.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/12/91 | 3.10 | 558.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/13/91 | 4.90 | 882.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/15/91 | 3.00 | 540.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/16/91 | 5.90 | 1,062.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/17/91 | 4.20 | 756.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/20/91 | 5.70 | 1,624.50 | MEETING W/LARSEN RE: EXECUTIVE COMPENSATION AND FRAUDULENT CONVEYANCE ISSUES; |
| 9/20/91 | 4.10 | 738.00 | FRAUDULENT CONVEYANCE ANALYSIS (factual and legal research); |
| 9/23/91 | 3.20 | 576.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/24/91 | 4.10 | 738.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 9/26/91 | 5.80 | 1,044.00 | FRAUDULENT CONVEYANCE RESEARCH (1.3) (Analysis, factual and legal); |
| 11/06/91 | 6.10 | 1,098.00 | REVIEW INTERCO FRAUDULENT CONVEYANCE ANALYSIS; |
| 11/07/91 | 3.10 | 558.00 | REVIEW INTERCO FRAUDULENT CONVEYANCE ANALYSIS; |
| 11/12/91 | 4.60 | 828.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 11/13/91 | 4.90 | 882.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 11/14/91 | 5.20 | 936.00 | FRAUDULENT CONVEYANCE RESEARCH—REVIEW INTERCO ANALYSIS; |
| 11/15/91 | 2.10 | 378.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research); |
| 11/20/91 | 7.70 | 1,386.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [This is the only task in this entry]; |
| 11/21/91 | 7.30 | 1,314.00 | FRAUDULENT CONVEYANCE ANALYSIS—REVIEW CLOSING DOCUMENTS RE: BUFFALO TRANSACTION. [Only task in entry]; |
| 11/22/91 | 6.10 | 1,098.00 | FRAUDULENT CONVEYANCE ANALYSIS—REVIEW CLOSING DOCUMENTS RE: BUFFALO TRANSACTION. [Only task in entry]; |
| 11/24/91 | 4.80 | 864.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [This is the only task in this entry]; |
| 11/25/91 | 4.10 | 738.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research) (1.7); |
| 11/26/91 | 2.30 | 414.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 12/01/91 | 6.30 | 1,134.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 12/02/91 | 6.10 | 1,098.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 12/03/91 | 9.20 | 1,656.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same); |
| 12/04/91 | 8.40 | 1,512.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual. research; draft memo re: same); |
| 12/31/91 | 2.60 | 468.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same); |
| 1/02/92 | 3.70 | 666.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same); |

it is not difficult to conclude that the effort and time exceeded its quality and therefore its probable usefulness.[10] In fact it appears that a cursory reading of a few pages of any of several recognized bankruptcy treatises would have provided more and better analysis.[11]

Viewing the fraudulent conveyance memorandum in conjunction with the Objectors' Exhibit 1, a prior draft of the memorandum, it becomes apparent that this assignment served more to provide training in memo writing for firm associates than to provide the client with insightful legal analysis. Likewise, the Objectors' Exhibits 3 and 4 represent earlier and later drafts of a memorandum regarding a possible action

for professional malpractice. This memorandum is admittedly more extensive in its legal analysis; however, the editorial comments in both drafts are akin to those which might be given by a law school instructor attempting to teach a law student how to write legal memoranda. Generally, the submitted work gives the impression that the bankruptcy estate is asked to pay for the education of firm associates at the expense of the creditors.

## ACCUMULATION OF EXCESSIVE HOURS

In consideration of its fees, WGM has requested this court to consider the plans it has drafted in this case. WGM has devel-

| Date | Hours | Amount | Description |
|---|---|---|---|
| 1/03/92 | 5.80 | 1,044.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and search; draft memo re: same); RESEARCH CHOICE OF LAW ISSUES RE: SAME; |
| 1/05/92 | 7.20 | 1,296.00 | DRAFT FRAUDULENT CONVEYANCE MEMO TO B. ROSEN. [Only task in entry]; |
| 1/06/92 | 6.20 | 1,116.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same); |
| 1/07/92 | 7.70 | 1,386.00 | FRAUDULENT CONVEYANCE ANALYSIS. [Only task in entry]; |
| 1/10/92 | 2.60 | 468.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 1/12/92 | 2.80 | 504.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 1/13/92 | 3.10 | 558.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research; draft memo re: same). [Only task in entry]; |
| 1/15/92 | 7.90 | 1,422.00 | FRAUDULENT CONVEYANCE ANALYSIS (legal and factual research re: same; Draft memo re: same); |
| 1/16/92 | 10.30 | 1,854.00 | DRAFT FRAUDULENT CONVEYANCE ANALYSIS; |
| 1/17/92 | 9.30 | 1,674.00 | REVISE FRAUDULENT CONVEYANCE MEMO. [Only task in entry]; |
| 1/18/92 | 10.20 | 1,836.00 | REVISE FRAUDULENT CONVEYANCE MEMO. [Only task in entry]; |
| 1/19/92 | 13.50 | 2,430.00 | REVISE FRAUDULENT CONVEYANCE MEMO; SEND SAME TO ROSEN FOR REVIEW. [Only task in entry]; |
| 1/29/92 | 1.50 | 195.00 | READ MEMO ON FRAUDULENT CONVEYANCE; |
| 1/31/92 | 2.70 | 486.00 | FRAUDULENT CONVEYANCE ANALYSIS (revise memo; factual and legal research re: same); |
| 2/04/92 | 5.90 | 1,062.00 | REVISE FRAUD CONVEYANCE MEMO; |
| 2/05/92 | 7.30 | 1,314.00 | UPDATE FRAUDULENT CONVEYANCE ANALYSIS (revise memo re: same); |
| 2/06/92 | 7.70 | 1,386.00 | UPDATE FRAUD. CONVEYANCE ANALYSIS (legal and factual research re: same revise memo re: same); |
| 3/07/92 | .40 | 52.00 | READING INTERCO FRAUDULENT CONVEYANCE ANALYSIS [Only task in entry]; |

**10.** Although a partner at WGM could not state the exact amount of time ultimately spent on research of the fraudulent conveyance project, he testified that the project initially had an estimated cost of approximately $250,000.00 *Transcript,* at 78.

**11.** *See, e.g.,* 4 *Collier on Bankruptcy,* ¶ 544.03 (Matthew Bender, 15th Ed 1992); 1 Ginsberg & Martin, *Bankruptcy: Text, Statutes, Rules,* § 9.02 (Prentice Hall, 3d Ed 1992); 2 Norton Bankruptcy Law and Practice, § 34.17 (Clark Boardman Callaghan 1992).

oped at least eight plans. *Transcript*, at 24. While WGM's industry may be commended, I must question the propriety and efficacy of such an enormous investment of time and effort.[12] The drafting appears to have preceded rather than reflected negotiation. An attorney at WGM labelled four of the eight identified plans "consensual" despite his testimony that the plans were drafted prior to finalization of agreed terms. *Transcript*, at 33–34, 81–82. Rather than representing the product of considered negotiation, the proliferation of eight or more plans reflected instead WGM's stated strategy of having a plan ready to file at any given moment. *See Transcript*, at 81–82.

As further justification for its labor, WGM contended that the myriad plans addressed the different contingencies inherent in the case, particularly with respect to tax implications. *Transcript*, at 15–16, 24, 115–122. While some anticipation of issues is essential in the Chapter 11 plan process, time spent memorializing possible scenarios would have been better spent facilitating discussion and resolution of those issues. Although nothing in the Bankruptcy Code limits the number of plans that may be submitted and considered, eight or more plans prepared by a creditors' committee under the circumstances of this case exceeds the bounds of reasonableness.

A sampling of WGM's exhibits reveals the same superfluity with respect to its other submissions. WGM has submitted, as WGM Exhibit 41 (under seal), no less than eighteen separate drafts of its objection to Tak's second disclosure statement. Representing approximately 500 pages and untold hours of work, this effort further illustrates the waste and inefficiency which has resulted in exorbitant attorney fees. *See also Charles v. Daley*, 846 F.2d 1057 (7th Cir.1988), *cert. denied Diamond v. Charles*, 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 564 (1989).[13] At least in this court, while the identification of issues on which to base objections to a disclosure statement is a matter of serious concern, the written presentation of those objections is hardly an art form requiring eighteen drafts to achieve perfection. Local counsel might well have so advised WGM if they had been consulted.

### ROLE OF LOCAL COUNSEL

The committee's application for retention of counsel memorializes its commitment to engage its counsel efficiently, stating:

> The Committee will endeavor to make the appointment of joint counsel as efficient as possible. The Committee does not anticipate that the services which will be rendered by WGM and Foley will be duplicative and will take all appropriate steps to ensure that such event does not occur. In that regard, the Committee contemplates that Foley will handle as many matters as possible locally, while WGM will handle matters on the East Coast where substantially all of Tak's creditors are located and will handle negotiations with Tak and its secured creditors with regard to the restructuring of its indebtedness and a plan of reorganization.

WGM Exhibit 1, ¶ 12. Elsewhere in the application for retention, the committee states:

> Similarly, Foley is situated in Madison, Wisconsin, is aware of the local rules and

---

**12.** Although he did not know how many hours WGM spent developing the plans, a partner at WGM estimated that two-thirds of the time requested in the current fee application is attributable to plan development. *Transcript*, at 26. Using this estimate, WGM spent approximately 2,931.85 hours of 4,442.20 hours developing its numerous plans.

**13.** In *Charles v. Daley*, the Seventh Circuit found excessive the hours spent by attorneys for pre-argument preparation appealing a case under 42 U.S.C. § 1988. The court cited favorably a case in which the First Circuit reduced fees, stating "[t]he standard of service to be rendered and compensated in cases such as this one is not one of perfection … rather, 'a litigant is entitled to attorney's fees under 42 U.S.C. § 1988 for an effective and completely competitive representation but not one of supererogation.'" *Charles*, 846 F.2d at 1076 (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 953–954 (1st Cir.1984)). In *Charles*, the Seventh Circuit reduced the fees requested in two areas: the excessive reviewing and revising of briefs and submissions, and the holding of in-person mock oral arguments in various locations where the use of conference calls would have served just as well. *See Charles*, 846 F.2d at 1076.

practices of the Court and is accessible to the Court for the multitude of hearings which will be undoubtedly scheduled. As such, Foley provides a mechanism for the Committee to curtail excessive costs and expenses.

WGM Exhibit 1, ¶ 7. Despite this language, the committee has not taken advantage of its competent local counsel in this case. Notwithstanding the presence of Foley & Lardner, a firm well-versed in bankruptcy and the practices of this court, WGM has unnecessarily performed many activities that more efficiently could have been performed by local counsel. For example, according to the time sheets, associates at WGM have researched issues involving Wisconsin law.[14] The memorandum addressing the professional malpractice claim discusses Wisconsin law in detail. In addition, WGM has billed numerous hours reviewing the work of Foley & Lardner in the FCC broadcast license appeal.[15] No valid reason has been given for the necessity of that review.

**14.** Entries specifically referring to Wisconsin law include, but may not be limited to:

| Date | Time | Amount | Description |
|---|---|---|---|
| 2/03/92 | 3.20 | 416.00 | RESEARCHING WISCONSIN CHOICE OF LAW (Re: Professional Malpractice actions against Tak's professionals) |
| 2/07/92 | 6.80 | 884.00 | RESEARCHING MALPRACTICE (ATTORNEY AND ACCOUNTANT) IN N.Y.; WRITING MEMO SECTIONS ON MALPRACTICE IN N.Y. AND WISCONSIN |
| 2/25/92 | 8.30 | 1,079.00 | RESEARCH THIRD PARTY ACTION AGAINST ACCOUNTANTS IN WISCONSIN; FINALIZING OBJECTION TO ASSIGNMENT OF CLAIMS |
| 2/26/92 | 4.10 | 533.00 | RESEARCHING ATTORNEY MALPRACTICE UNDER WISCONSIN LAW (re: possible actions against Tak's professionals) |
| 2/27/92 | 6.70 | 871.00 | RESEARCHING NEGLIGENT MISREPRESENTATION, NEGLIGENCE, BREACH OF FIDUCIARY DUTY AND BREACH OF CONTRACT IN WISCONSIN FOR ACCOUNTANTS, FINANCIAL ADVISORS AND LAWYERS (re: possible malpractice actions against Tak's professionals) |
| 2/28/92 | 4.30 | 559.00 | RESEARCHING AND EDITING SECTION OF MEMO ON DEBTOR'S CAUSES OF ACTION (against professionals) IN WISCONSIN |
| 3/02/92 | 6.60 | 858.00 | RESEARCHING AND WRITING SECTION ON NEGLIGENT MISREPRESENTATION IN WISCONSIN; RESEARCHING ACCOUNTANT LIABILITY IN N.Y. (all re: malpractice action against Tak's professionals) |
| 3/10/92 | 9.80 | 1,274.00 | EDITING SECTION OF CHOICE OF LAW AND BORROWING STATUTE; WRITING SECTION ON ATTORNEY–CLIENT PRIVITY IN WISCONSIN; BREACH OF CONTRACT IN N.Y. (all re: malpractice actions against Tak's professionals) |

It may be inferred that entries in the time sheets referring to work on the memorandum addressing malpractice actions against Tak's professionals also include research and incorporation of Wisconsin law. However, to conserve space and time, only those entries specifically referencing Wisconsin law are noted.

**15.** Entries apparently relating to the FCC litigation include, but may not be limited to:

| Date | Time | Amount | Description |
|---|---|---|---|
| 9/06/91 | 5.30 | 954.00 | FRAUDULENT CONVEYANCE ANALYSIS—REVIEW DOCUMENTS SENT BY B. WILLIAMSON & B. MERCER; REVIEW AND REVISE COMMITTEE BRIEF RE: FCC LICENSE LITIGATION; MTG W/D. LOWE RE: CASE FILING. |
| 9/06/91 | 5.10 | 1,453.50 | TCS: LALIM (status and WUSL); SIMSOLO (re: WUSL management), HARRIS (and) COHEN (re: WUSL management), VAN SICKLEN; REVIEW WILLIAMSON LETTER; FINALIZE AND FILE MEMORANDUM RE: FCC LITIGATION; OC: LARSEN (re: FCC litigation). |

Ironically, one obvious deficiency, that of failing to meet the requirements for fee applications in the district, arose in an area to which Foley & Lardner is particularly attuned. Foley & Lardner was the applicant in the *Moody* [16] case, and has appropriately modified its approach to service and billing in bankruptcy since that decision. To fail to consult local counsel on even such a notoriously local issue as fee allowance seems ample evidence of WGM's unreasonable approach to the use of local counsel throughout this case. Failure to properly use local counsel obviously led to inefficiencies which were exacerbated by the differences between the hourly billing rates of WGM and Foley & Lardner.[17]

As long as the statutory requirements for employment are met, there is no question that a creditors' committee may employ counsel of its choosing and a court should not interfere in that decision. Yet, where, as here, the creditors' committee has expressly employed joint counsel in the name of efficiency, some manifestation of economy should be readily apparent. Quite the contrary is apparent in this case.

## SUFFICIENCY OF FEE APPLICATION

■ The form of WGM's fee application has precipitated extensive time and effort on the part of the former objectors and the court in deciphering the entries. It makes precision in calculating the appropriate fee in this case virtually impossible. WGM's submission of a fee application in the current form is incredible in light of this court's decisions in *Reliable Investors* and *Chapman Farms*. Surely a reputable law firm such as WGM could not misinterpret the clear mandate of the *Reliable Investors* case. At the risk of repeating the obvious, if the court cannot determine the time spent on a particular task, the inference lies against the law firm. In apparent recognition of the application's inadequacies, WGM submitted on September 29, 1992, a copy of its time sheets with handwritten descriptions further explaining the entries. The partner of WGM who testified at the October 23, 1992 hearing conceded that the court or another party could not, without his assistance, allocate the time spent on the individual tasks in an entry by looking at the time sheets. *See Transcript*, at 56, 58, 66–68. At one point in his testimony and with reference to a specific entry, the partner admitted that it would be impossible to determine the amount of time spent on each discrete activity.[18] Yet, despite these admissions and in flagrant disregard

| Date | Time | Amount | Description |
|---|---|---|---|
| 9/10/91 | 5.80 | 1,653.00 | MEETING W/LARSEN RE: FCC LITIGATION; REVIEW FINAL FCC BRIEF IN OPPOSITION; REVIEW FRAUDULENT CONVEYANCE DOCUMENTS; TCS: VAN SICKLEN (and) WALSH (re: FCC Litigation), LALIM (re: status), BALL (re: WUSL management), HARRIS (re: models of projected returns), SIMSOLO. |
| 9/20/91 | 4.10 | 738.00 | CONF. W/B. ROSEN RE: COMPENSATION OF TAK AND FCC LITIGATION; TC W/R. COHEN RE: SCHEDULE FOR MOTION TO REDUCE COMPENSATION; CONF. W/LOWE RE: SAME; REVIEW SAME; SEND SAME TO COHEN FOR REVIEW; FINALIZE FEE APP.; TC W/SIMON AND NAVARRO RE: SAME; FRAUDULENT CONVEYANCE ANALYSIS. |
| 9/23/91 | 6.8 | 1,938.00 | TCS: COHEN (re: model), LALIM, SIMSOLO, FINE, WALSH, VAN SICKLEN (all re: FCC litigation); TRAVEL TO MADISON; PREPARE FOR HEARING. |
| 9/24/91 | 11.80 | 3,363.00 | PREPARE FOR SUMMARY JUDGMENT HEARING; S.J. HEARING; TRAVEL TO NEW YORK; TSC: SIMSOLO, LALIM, COHEN (re: FCC litigation). |

16. *In re Moody*, 1984 WL 32, No. MM11–83–00167 (Bankr.W.D.Wis.1984).

17. WGM's hourly rates range from $390.00 per hour to $50.00 per hour. In contrast, the hourly rates of Foley & Lardner currently range from $230 per hour to $50 per hour. *See* Seventh Application For Payment of Interim Compensation to Joint Counsel for the Unsecured Creditors' Committee, filed March 17, 1993.

18. The relevant excerpt from the transcript of the hearing provides:

Q Simply by way of illustrating, what would be a much longer series of questions, I would like to simply refer you by page and date to four or five entries. Page 156, November 6, 1991—

A Yes, sir.

of the direction from this and other courts, WGM requests attorneys' fees by a nearly indecipherable application.

WGM has its principal office in New York City, and it was from that office that its representation in this case was undertaken. It may be suggested, therefore, that WGM was proceeding as it might in its "home" court. So, although not directly implicated in this case,[19] the Guidelines for Fees and Disbursements for Professionals ("Guidelines") generated by the Southern District of New York provide an interesting foil against which to examine WGM's fee application. Representing one district's response to the Code's mandate to review attorneys' fees, the Guidelines attempt to clarify the contents and form of an acceptable fee application. The Guidelines specifically require the use of detailed descriptions and task billing.[20] At the hearing, the lead partner testified that he was familiar with the Guidelines and that WGM had submitted applications conforming to those Guidelines in cases pending in the Southern District of New York. *Transcript*, at 60. From this testimony, it is apparent that WGM is capable of filing a detailed, task-oriented fee application. In light of its size, experience, and familiarity with bankruptcy law and the Guidelines, I am somewhat surprised that WGM does not standardize its billing practices to conform with the Southern District's well-recognized and frequently adopted rules. Yet, when asked at the hearing if WGM employed the Southern District's Guidelines in this case, the partner displayed an almost flippant atti-

tude toward the inapplicability of his home district's rules, stating "[t]here is no need to." *Transcript*, at 60.

## CONCLUSION

My review of the record, the exhibits, and the Seventh Circuit's standards for fee applications compels me to conclude that WGM's requested fees do not approach "reasonable" by any stretch of the imagination. On the contrary, the fee application and exhibits are replete with examples illustrating an inefficient use of time and accumulation of hours beyond those reasonably necessary for the case. The poor quality of some of WGM's work and the failure to utilize local counsel further militate against a finding of reasonableness in the fee request. Finally, the absence of detailed description and "task" billing greatly hinders my ability to determine the time spent on specific tasks.

With respect to WGM's requested expenses, I can discern nothing from this application to suggest that the expenses did not accrue in rough proportion to the services for which fees are sought. Based on my sampling of services I will treat, as I have in my initial allowance, the expenses to be allowed as roughly reflected by those services. No greater precision is possible under the application or the evidence received.

For the reasons stated herein, I somewhat reluctantly confirm my September 30, 1992 order allowing $500,000.00 in fees and

---

Q Now, from the bill is it possible to determine how much time was spent on each activity that day?
A By whom?
Q By Ms. Larsen.
A From the bill, no.
Q Would there be a way putting aside the bill, to determine the amount of time spent on each discrete activity?
A At this time in judging this being almost one year old, I think it's impossible to do so.
*Transcript*, at 65–66. *See also id.* at 67–68.

**19.** To avoid any ambiguity regarding the form of fee applications required in this case, at the close of the October 23, 1992 hearing, I adopted

the Guidelines of the Southern District of New York for future fee applications in this case.

**20.** The Guidelines provide:
Time records must set forth in reasonable detail an appropriate narrative description of the services rendered. Without limiting the foregoing, the description should include indications of the participants in, as well as the scope, identification and purpose of the activity that is reasonable in the circumstances, especially in relation to the hours sought to be charged to the estate for that particular activity.
Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, page 4, ¶ 2 (1991) (footnote omitted).

$50,000.00 in expenses. The remainder sought by the application is disallowed.